IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| v. | ) | Criminal Action No. 15-59-GMS |
| KEVIN CHAMBERS, | ) | |
| Defendant. | ) | |

## MEMORANDUM

### I. INTRODUCTION

On November 12, 2015, the Grand Jury for the District of Delaware indicted Defendant Kevin Chambers ("Chambers") for one count of knowingly and intentionally conspiring to possess with intent to distribute controlled substances and two counts of knowingly and intentionally possessing with the intent to distribute controlled substances, all in violation of 21 U.S.C. § 841(a) and (b)(1)(B). Presently before the court is Chambers' Motion to Suppress Evidence. (D.I. 19.) The court held an evidentiary hearing on March 7, 2017 (D.I. 38) and subsequently directed the parties to file proposed findings of fact and conclusions of law. After having considered the testimony elicited during the hearing and the arguments presented in the parties' submissions on the issues, the court will deny Chambers' motion.

### II. FINDINGS OF FACT

At the evidentiary hearing, the United States called one witness: Eric Miller ("Miller"), a Special Agent of the Drug Enforcement Administration ("DEA"). After listening to the testimony of the witness, the court concludes that the account of the facts provided by Miller are credible.

The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

On October 28, 2015, agents executed a search warrant at the home of a drug supplier who later became a DEA confidential source ("CS"). (Tr. 10:22-24, D.I. 38.) In a subsequent interview of the CS on November 2, 2015, the CS told Miller about a man he knew as "Will" whom he supplied with kilogram quantities of cocaine and heroin. (Tr. 11:6-21.) The CS described "Will" as a black male, confined to a wheelchair, who previously lived in Delaware but currently lived out of state. (*Id.*) According to the CS, "Will" owed him approximately $100,000 for the drugs he previously supplied. (*Id.*)

Thereafter, Miller took steps to verify the CS's claims about the previous drug transaction with "Will." (Tr. 12:21-23.) First, Miller reviewed the CS's cellular phone for text messages between the relevant parties. (Tr. 12:18-19.) The CS directed Miller to review text messages under the contact "Cojo," which is slang for "walks with a limp" in Spanish. (Tr. 14:2-5.) The phone number was a 281 area code, which Miller recognized as being outside of the state of Delaware. (Tr. 16:8-10.) Miller reviewed numerous text messages between the CS and "Will," many of which, in his view, corroborated the CS's information. *See generally* Tr. 16-22 (referencing Government's Ex. 1). Miller testified, based upon his training and experience, that those text messages used common drug terms such as "the game" (the drug game), "bread" (money), and "[w]hole chicken" (kilogram).[1] (Tr. 16:24-25; 18:3-14; 19:19-20:6.)

Second, Miller instructed the CS to make a recorded phone call to "Will." (Tr. 22:16-23:8.) During this call, the CS and "Will" discussed drugs, first using the word "girl" as a

---

[1]Chambers challenged Miller's knowledge of coded/cryptic language. *See* Tr. 76-80. The record established that some terms such as "whole chicken" or "girls" have multiple meanings based on context. Because Miller derived his testimony from his training, experience, and conversations with the CS, the court finds his testimony credible.

2

substitute for a kilogram of cocaine. (Tr. 25:12-26:8.) Using the term "bread" for money, "Will" explained that he had about $60,000 for the CS to pick up. (Tr. 26:12-27:7.) Next, the conversation turned to heroin, specifically the use of different color bags and brands for the heroin "Will" was going to sell. (Tr. 27:8-29:15; 31:14-32:9.) The CS offered five or six more kilograms to "Will," and the parties agreed that they should meet up again. (Tr. 30:25-31:13.)

Finally, Miller continued to communicate with "Will" after the recorded phone conversations, posing as the CS. (Tr. 32:19-24.) After a failed attempt to meet up on November 2, 2015, Miller confirmed the drug order with "Will" on November 4, 2015: two "girls"—or kilograms of cocaine—for $60,000. (Tr. 34:23-36:5) (referencing Government's Ex. 4.) After confirming via text message the meeting location as Harrah's casino in Chester, Pennsylvania, Miller parked his car on the fourth floor of the parking garage and attempted to locate Chambers inside the casino. (Tr. 38:13-39:12.) Eventually, "Will" sent a text message indicating that he was on the fourth floor. (Tr. 39:23-24.) Thereafter, Miller returned to the parking garage to look for "Will." (Tr. 40: 3-4.)

Miller testified that he was looking for a specific person: a black male who uses a wheelchair, likely in a rental car, and was on the fourth floor of the Harrah's parking garage. (Tr. 40:5-13.) Immediately after walking out of the casino, Miller noticed a sedan that was illegally parked on the fourth floor of the Harrah's parking garage, with the motor running. (Tr. 40:17-41:14.) He observed a folded-up wheelchair in the back of the car, and that the driver, a black male, was the only occupant in the car. (Tr. 40:17-41:2, 41:19-21.)

After finding that the defendant matched the description of "Will" and was in the same location where "Will" stated he would be to consummate a drug transaction, Miller approached the driver's side of "Will's" vehicle and knocked on the window. (Tr. 41:22-42:8.) At that time,

3

Miller was in plain clothes, and he did not have a firearm visible. (Tr. 51:22-52:9.) Chambers lowered the window all the way down. (Tr. 42:13-15.) When Chambers lowered the window, Miller identified himself as a law enforcement officer and showed Chambers his badge and credentials. (Tr. 42:16-22.) As he identified himself, Miller noticed a large, cane-like mechanical device near Chambers' right arm. (Tr. 43:6-13.) The device was facing down towards the floorboards. (Tr. 43:20-23.)

Miller then asked Chambers why he was in the parking lot at Harrah's. (Tr. 42:23-25; 45:10-12.) Chambers replied that he was waiting for a girl. (Tr. 43:1.) Next, Miller asked Chambers if he had large amounts of money on him. (Tr. 43:2-5.) Chambers responded by pointing to a pink backpack that was in the rear seat on the wheelchair. (*Id.*)

After asking these questions, Miller noticed two cellphones between Chambers' legs. (Tr. 44:22-45:9.) Miller then called the phone number he was using to text message with "Will." (Tr. 45:17-22.) He testified that he observed one of the phones in Chambers' lap "li[ght] up" and heard the phone ring. (Tr. 45:23-24, 46:10-12.)

The pre-arrest interaction between Chambers and Miller took place outside of the driver's side window of Chambers' vehicle. (Tr. 46:13-16.) Miller explained that there were very few people in the parking lot at the time. (Tr. 61:11-23.) The pre-arrest interaction lasted approximately thirty to sixty seconds, Miller's voice remained calm throughout. (Tr. 51:2-7.)[2] Miller did not give any commands to Chambers. (Tr. 51:13-21.) Miller and his partner never drew their firearms on Chambers. (Tr. 52:19-23.) Lastly, no vehicles were used to "box-in" Chambers' car and prevent him from driving away. (Tr. 52:24-53:8.)

---

[2] Miller testified that his partner, TFO Kelly, did not speak to Chambers during pre-arrest period. (Tr. 51:11-13.)

4

After observing that Chambers was in possession of the phone used to arrange a drug transaction, Miller told him he was under arrest. (Tr. 53:17-23.) Miller then read Chambers his *Miranda* warnings, verbatim, from his DEA card. (Tr. 53:24-55:6.)[3] Miller explained to Chambers that he was arrested because he was supposed to purchase two kilograms of cocaine for approximately $60,000. (Tr. 55:17-19.) Chambers seemingly indicated that this was true by nodding his head in the affirmative. (Tr. 55:20-24.)

Miller testified that, based on the entirety of his investigation, he believed he had probable cause to search the vehicle, particularly for a large amount of cash. (Tr. 56:9-16.) DEA agents found approximately $52,000 in the pink/purple backpack, and more money in a black bag under the passenger seat of the vehicle.[4] (Tr. 56:17-23.) Approximately an hour later, Chambers provided another statement to Miller. (Tr. 57:16-58:10.) The tone and tenor of that recorded interview was "calm and relaxed." (Tr. 59:22-60:1.) During this questioning, Chambers acknowledged that he was read his *Miranda* warnings earlier in the evening. (Tr. 60:7-13.)

## III. CONCLUSIONS OF LAW

Chambers asserts that the physical evidence obtained as a result of the above-described arrest must be suppressed as a product of an unreasonable search and seizure in violation of the Fourth Amendment. (D.I. 39 at 10.) Chambers also contends that the oral statements obtained before and after his arrest should be suppressed as a violation of the Fifth Amendment. (*Id.*) Specifically, Chambers alleges that: (1) he was in custody during Miller's questioning and the responses to those questions should be suppressed because he was not read his *Miranda* rights (D.I. 39 at 20-22); (2) he was questioned without reasonable suspicion during the time Miller

---

[3] According to Miller, Chambers acknowledged, by nodding his head, that he understood his rights and was willing to answer questions. (Tr. 55:7-12)

[4] Miller testified that the money was eventually counted in total and amounted in $62,801. (Tr. 56:24-57:2.)

5

initially encountered him (D.I. 19 at 18); (3) Miller did not have probable cause to arrest him (D.I. 39 at 15-16, 18); (4) the search of his vehicle was unreasonable because there was no warrant and no exception to the Fourth Amendment applied (D.I. 39 at 17-19); (5) the phone call placed by Miller to his cell phone was an unlawful search (D.I. 19 at 16); and (6) his arrest, the search of his vehicle, and the phone call placed to "Will's" phone were all tainted evidence that should be subjected to the exclusionary rule. (D.I. 39 at 24.)

Conversely, the government argues that the physical and oral evidence obtained from Chambers were legally obtained because: (1) during the initial encounter between Chambers and Miller, he was not in custody (D.I. 42 at 6-12); (2) as a result, Miller was not required to read Chambers his *Miranda* rights during this interaction (D.I. 42 at 7, 9-12); (3) Chambers validly waived his *Miranda* rights post-arrest (D.I. 42 at 12-13); (4) Miller had probable cause to arrest Chambers and to search his vehicle pursuant to a search incident to arrest and automobile exceptions to the Fourth Amendment (D.I. 42 at 15-19); and (5) Miller's call to Chambers' cell phone did not amount to a search. (D.I. 42 at 13-15.)

### A. Validity of Miller's Pre-arrest Interactions with Chambers

Chambers contends that he was in custody during Miller's initial interaction with him and that the agent failed to deliver his *Miranda* warnings before the interaction commenced. (D.I. 19 at 21-22.) On the other hand, the government argues that Chambers was not in custody during this initial portion of the encounter. (D.I. 42 at 6-12.) The government further argues that even if the court finds Chambers was detained during the initial questioning, Miller had reasonable suspicion to detain him. (D.I. 42 at 6-9.) The court concludes that Chambers was not in custody at the time Miller first questioned him and Miller had reasonable suspicion to conduct an investigatory detention.

### 1. Custodial Interrogation

Prior to the initiation of a custodial interrogation, among other things, an officer is required to warn a citizen of their right to remain silent and their right to counsel. *Miranda v. Ariz.*, 384 U.S. 436 (1966). The answer to the question of whether an interrogation is custodial in nature turns on whether a detained person faces pressures that sufficiently impair his free exercise of his privilege against self-incrimination. *Berkemer v. McCarthy*, 468 U.S. 420, 437 (1984). There is certainly an element of coercion and interference with ones exercise of free will when, whether pulled over or, as here, sitting in an automobile and approached by someone who identified themselves as a law enforcement officer and being subjected to questions by that officer. *Id.* at 436. Nevertheless, custody is not established simply because an officer approaches a citizen in his or her vehicle and asks questions, regardless of the citizen's status as a suspect or target of an investigation. *See id.* at 439 (acknowledging that even if a motorist is questioned inside his or her vehicle and is not free to leave, that does not rise to the level of custody required by *Miranda*); *Cal. v. Beheler*, 463 U.S. 1121, 1125 (1983) (noting that *Miranda* warnings are not required "simply because . . . the questioned person is one whom the police suspect"). Courts consider a variety of factors when determining if a person was in custody during the period under scrutiny, including: (1) whether the officers told the suspect he was under arrest or free to leave; (2) the length of the interrogation; (3) whether the suspect voluntarily submitted to questioning; (4) whether the officers used coercive tactics such as hostile tones of voice, the display of weapons, or physical restraint of the suspect's movement; and (5) the location or physical surroundings of the interrogation. *U.S. v. Willaman*, 437 F.3d 354, 359-60 (3d Cir. 2006).

Here, Chambers argues that he was in custody during his first encounter with Miller because he "knocked on the window and introduced himself as being a law enforcement officer" before asking Chambers two questions. (D.I. 19 at 20.) The court disagrees.

The court concludes that Chambers was not in custody at the time of his initial interaction with Miller. This finding is supported by the *Willaman* factors. First, although Chambers was not told that he was free to leave and was placed under arrest immediately after questioning, the government correctly points out that this is the only factor that weighs in favor of Chambers. (Tr. 53:17-23) (D.I. 42 at 11.)

In contrast, the record establishes that Miller did not use a hostile tone of voice, display a weapon, or make any attempt to block the defendant's vehicle. *Willaman*, 437 F.3d at 360. Indeed, he was dressed in street clothes, carrying a concealed weapon and by himself when he approached Chambers' vehicle. Moreover, the questioning occurred in a public parking lot and not the unfriendly confines of a police station house. The questioning was also limited in duration. Indeed, Miller asked but two questions: Why are you here and do you have a large amount of money on you. The process took 30–60 seconds and occurred after Chambers voluntarily lowered his window in response to Miller's knock. (Tr. 46:13-16, 42:23-25; 45:10-12, 43:2-5.)

Given these facts, the court cannot conclude that Chambers was in custody during his initial interaction with Miller.

## 2. Investigatory Detention

The Fourth Amendment protects citizens from unreasonable searches and seizures. U.S. CONST. AMEND. IV. If there are objective indicia that cause an officer to reasonably suspect that criminal activity is afoot, the officer may temporarily detain a citizen for questioning. *Terry v. Ohio*, 392 U.S. 1 (1968). An officer may conduct an investigative stop if the officer can "point to

8

specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Reasonable suspicion is established upon the corroboration of tips from a confidential source, depending their content and reliability. *Ala. v. White*, 496 U.S. 325, 330-31 (1990). Once significant aspects of the source's predictions have been corroborated, an officer may impart "some degree of reliability to the other allegations made by the [informant]." *Id.* at 332. In *White,* for example, the court found that the officers had reasonable suspicion based on an anonymous tip even though not every aspect of the tip was verified. *Id.* at 331. The unverified portions of the tip, however, did not prevent the court from finding that "the totality of the circumstances of the anonymous tip, as corroborated, exhibited sufficient indicia of reliability to justify the investigatory stop of [the] respondent's car." *Id.* at 332.

Here, Miller had reasonable suspicion to detain Chambers for an investigatory stop. Miller knew the CS who provided him with the information about "Will." (Tr. 10:22-24.) He questioned the CS in person about "Will" and the CS informed Miller that "Will" was a black male from out of state who used a wheelchair to whom he had supplied large quantities of cocaine and heroin in the past. (D.I. 42 at 7) (Tr. 11:6-21.) Miller corroborated the information from the CS by reviewing the CS's text messages with "Will." (Tr. 14:2-5.) The CS also placed a recorded call to "Will" where the two discussed drugs and "Will" explained that he had $60,000 for the CS to pick up. (Tr. 25:12-26:8, 26:12-27:7.)

Miller continued to communicate with "Will" and arranged a meeting at Harrah's casino. (Tr. 38:13-39:12.) There, "Will" arranged to purchase two kilograms of cocaine for $60,000. (Tr. 34:23-36:5.) On the day of the meeting, Miller confirmed that he would meet "Will" on the fourth floor of the parking garage at the casino. (Tr. 38:13-39:12.) Miller, after emerging from the casino

onto the fourth floor of the parking garage, noticed a black male sitting in an idling sedan with a wheelchair in the back of the car. (Tr. 40:17-41:14.) This man fit the description the CS provided of "Will." (Tr. 4:22-42:8.) These facts support the court's conclusion that Miller had reasonable suspicion to detain Chambers.

### B. Chambers' Post-Arrest Statements Are Valid

For a statement given by a defendant to be admissible, the government must establish that it was the product of the exercise of free will. *Colo. v. Connelly*, 479 U.S. 157 (1986). Put differently, the statement must be determined to have been given voluntarily, knowingly, and intelligently. *Id.* at 168. Absent such a finding, the waiver of an individual's statutory right against self-incrimination cannot stand.

The undisputed evidence supports the conclusion that Chambers voluntarily waived his right to remain silent. First, Miller read Chambers his *Miranda* rights verbatim from his DEA card. (Tr. 53:24-55:6.) Chambers nodded his head in the affirmative seemingly indicating his understanding of those rights. (Tr. 55:20-24.) Approximately an hour later, Chambers freely submitted himself to a recorded interview with Miller. (Tr. 59:22-60:1.) The court viewed the recorded video interview and could find no evidence of intimidation, coercion, or deception. The totality of the circumstances make clear that Chambers waived his rights voluntarily and knowingly.

### C. Miller Had Probable Cause to Arrest Chambers

Chambers contends that Miller did not have probable cause to arrest him for conspiracy to possess with the intent to distribute cocaine. (D.I. 39 15-17) Conversely, the government argues that Miller had probable cause to arrest Chambers. (D.I. 42 at 17-19.)

10

A warrantless arrest must be accompanied by probable cause. *U.S. v. Glasser*, 750 F.2d 1197, 1205 (3d Cir. 1984). Probable cause is determined from the perspective of an objective law enforcement officer in light of the totality of the circumstances known to that officer at the time. *Id.* An anonymous tip can provide a basis for probable cause so long as there is a substantial basis for crediting the source's tip. *U.S. v. Stearn*, 597 F.3d 540, 556 (3d Cir. 2010); *Ill. v. Gates*, 462 U.S. 213, 269 (1983). When assessing the sufficiency of a tip to establish probable cause, courts examine the totality of circumstances. *Id.* at 332. The totality of circumstances includes factors such as the informant's past reliability, his basis of knowledge for the tip, and the ability of law enforcement to corroborate the information provided. *Stearn*, 597 F.3d at 555.

Even if the corroboration of an anonymous informant's tip was solely related to seemingly innocuous activities by the defendant-suspect, this alone would not preclude a finding of probable cause. *Gates*, 462 U.S. at 269. The critical issue is not whether the activities observed by the police are innocent or suspicious, but whether the actions of the suspect give rise to an inference that the source is credible and that tipster obtained reliable information. *Id.*

In *Gates*, for example, a police department received an anonymous handwritten letter regarding a couple the author believed to be selling narcotics. *Id.* at 225. The letter also indicated where the couple lived; the couple's travel arrangements to and from Florida to retrieve drugs; the total amount that the drugs they would retrieve were worth; and the amount that the drugs already in the couples' possession were worth. *Id.* The Supreme Court found that although these activities may have seemed innocent, they were not because they fit a pattern of behavior that a trained law enforcement officer would have recognized as indicative of drug dealing activity. *Id.* at 269. Thus, the Court determined the corroboration of the tip's contents supported a finding that the officer had probable cause to arrest the defendant. *Id.* at 271.

Thus, the court finds that Miller had probable cause to arrest Chambers.

## D. Miller's Post-Arrest Search was a Valid Search Incident to Arrest

Chambers also contends that the search of his vehicle after his arrest was unconstitutional because it did not comport with the requirements for a search incident to arrest exception of the Fourth Amendment. (D.I. 19:15.)[5] The government argues that Miller had probable cause to search Chambers' vehicle and the search was subject to the search incident to arrest exceptions to the Fourth Amendment. (D.I. 42 at 17-19.) The court agrees.

A warrantless search is constitutional if it falls within an exception to the warrant requirement. *Ariz. v. Grant*, 556 U.S. 332, 343 (2009); *U.S. v. Ross*, 456 U.S. 798 (1982). One such exception is the search incident to arrest. (D.I. 42 at 15-19.)

A search incident to a lawful arrest does not violate the Fourth Amendment when it is reasonable to believe that evidence relevant to the crime of arrest might be found in the vehicle and containers therein. *Grant*, 556 U.S. at 343-44.[6] When an officer arrests a vehicle occupant for a drug offense, that officer has a reasonable expectation that evidence of the crime is in the vehicle. *Id.* at 344.

Here, the government satisfied its burden of showing that Miller's search was a valid search incident to arrest. Miller, as determined above, lawfully arrested Chambers for attempting to purchase two kilograms of cocaine. (Tr. 56:9-16.) Moments before the arrest, Chambers was in his vehicle and he informed Miller that he had a large amount of money in the backseat. (Tr. 43:2-5.) Miller conducted a search of the vehicle and, in addition to the money found in the backpack, discovered more money under the front passenger seat, an area of the vehicle where evidence of a

---

[5] Chambers also argues in his initial motion to suppress brief that Miller conducted an illegal search with respect to the use of a canine. At the hearing, the parties stipulated that this issue is moot. (Tr. 2:21-3:9.) Thus, the court need not address this argument.

13

In view of the facts established here, Miller had the requisite probable cause to arrest Chambers. In addition to the facts that laid the foundation for Miller's reasonable suspicion to detain Chambers, the actions that followed further establish probable cause. After identifying a man who fit the description of "Will" on the fourth floor of Harrah's parking garage, Miller approached an idling sedan and knocked on the window. (Tr. 41:22-42:8.) "Will" lowered his window. (*Id.*) Miller then identified himself to "Will" as a DEA officer and asked what he was doing there. (Tr. 42:16-22, 42:23-25; 45:10-12.) Chambers replied he was waiting for a "girl," which Miller knew meant cocaine. Miller based this conclusion on his drug enforcement experience, conversations he reviewed between the CS and "Will," and his own conversations with "Will" via text message. (Tr. 43:1, 25:12-26:8.) Miller then asked if "Will" had large amounts of money on him and Chambers responded by pointing to a pink/purple backpack in the rear seat. (Tr. 43:2-5.) Miller also called the phone number he used to communicate with "Will" prior to the meeting and observed the phone light up and heard it ring. (Tr. 45:23-24, 46:10-12.) Based on these facts, Miller was able to corroborate almost all of the information given to him by the CS prior to arresting Chambers.

Chambers' arguments to the contrary are unavailing. Chambers contends that Miller only corroborated innocuous facts about Chambers' appearance, location, and that he was meeting a "girl." (D.I. 39:20.) These seemingly innocuous details, however, taken together in light of Miller's law enforcement knowledge and knowledge from dealing directly with "Will," gave rise to an inference that Chambers was attempting to engage in criminal activity: first, Chambers was in the spot where he agreed to meet "Will"; next, Chambers fit the physical description the CS provided of "Will"; finally, "Will" informed Miller that he was there waiting for a "girl;" and Fourth "Will" confirmed his possession of a large amount of currency in his backseat.

12

drug crime would exist. (Tr. 56:17-23.) The court finds that Miller's search was valid under the search incident to arrest exception to the Fourth Amendment.[7]

## E. Validity of Miller's Phone Call and Observation of the Cell Phone Ringing

Chambers also contends that Miller conducted a warrantless search when he called Chambers' cell phone during their initial interaction. (D.I. 19 at 16.) A search under the Fourth Amendment only occurs when there is an expectation of privacy in the contents of the searched object. *Katz v. U.S.*, 389 U.S. 347, 360-62 (1967). Because of the unique nature of the information that could be collected from a cell phone and the amount of information that could be collected, society has recognized an individual's reasonable expectation of privacy in the contents of his or her cell phone. *Riley v. Cal.*, 134 S. Ct. 2473, 2494-95 (2014). Thus, a search of the contents of a cell phone without a warrant or an exception to the warrant requirement, would be a violation of the Fourth Amendment. However, a search does not occur when an officer simply calls an individual's cell phone and observes it ring. *See U.S. v. Lawing*, 703 F.3d 229 (4th Cir. 2012) (finding that an officer calling a suspect's cell phone and observing it ring is not a violation of the Fourth Amendment), *but see U.S. v. Claude*, No. CRIM.A. 12-33, 2013 WL 210249 (E.D. Pa. Jan. 16, 2013) (finding that an officer's request that a defendant produce his cellphone in order to observe it ring is a violation of the Fourth Amendment).

Here, the facts establish that Miller's call to Chambers' phone was not a search under the Fourth Amendment. First, Miller did not require Chambers to produce his phone, phone number, or phone contents in order to call it and observe it ring. Miller used the number the CS gave him for "Will" to call Chambers' cell phone. (Tr. 12:18-19.) Miller noticed the phone ringing as it sat

---

[7] Because the court has ruled on alternative grounds, the court does not need to reach a decision on whether Miller had probable cause to conduct the search or whether the automobile search exception to the Fourth Amendment applies.

between Chambers' legs in plain view. (Tr. 44:22-45:9.) Further, Miller did not request the phone at any point during their interaction in the parking garage in order to retrieve any of the phone's contents. (Tr. 51:13-21.) The court therefore concludes that Miller did not search Chambers' phone at all.

### F. The Application of the Exclusionary Rule

Chambers argues that the oral and physical evidence recovered by the police are fruits of the poisonous tree and should be subjected to the exclusionary rule. The exclusionary rule requires the exclusion of evidence tainted by the illegal investigatory tactics of the officers involved. *Wong Sun v. U.S.*, 371 U.S. 471 (1963); *Stearn*, 597 F.3d at 567. Chambers' fruit of the poisonous tree argument must fail because the court has found that Miller did not violate any of Chambers' constitutional guarantees.

## IV. CONCLUSION

For the foregoing reasons, the court denies the defendant's motion to suppress.

Dated: September 12, 2017

UNITED STATES DISTRICT JUDGE

15